**NOT FOR CITATION**

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff, | No.  CR 10-00111 JSW |
| v. | **ORDER GRANTING MOTION TO SUPPRESS** |
| DAVID HAMMOND, | |
| Defendant. | |

## INTRODUCTION

This matter comes before the Court upon consideration of the Motion to Suppress Fruits of Unlawful Search and Seizure, filed by Defendant, David Hammond ("Hammond").  The Court has carefully considered the parties' papers, the record in this case, relevant legal authority, and has had the benefit of oral argument.  The Court concludes that an evidentiary hearing on this motion is not necessary.  Hammond is charged in a two count Indictment with one count of felon in possession of a firearm, in violation of 18 U.S.C. § 922(g) ("Count One"), and one count of distribution of a controlled substance, in violation fo 21 U.S.C. § 841(a).  The instant motion is directed only at the evidence that forms the basis of the charge in Count One.  For the reasons set forth in the remainder of this Order, Hammond's motion is GRANTED.

## BACKGROUND

On January 31, 2010, at approximately 11:43 p.m., San Francisco Police Officers Timothy Buelow ("Officer Buelow") and Mari Noguchi ("Officer Noguchi") were on routine bicycle patrol in the vicinity of Turk and Leavenworth streets, in the Tenderloin neighborhood

1  of San Francisco.  (*See* Declaration of Timothy Buelow ("Buelow Decl."), ¶ 4; First Declaration
2  of Elizabeth Falk ("Falk Decl. I"), ¶ 3, Ex. A (San Francisco Police Department Incident Report
3  ("Incident Report") at DH-0012).)  Both officers were in uniform.  (Buelow Decl., ¶ 4; Incident
4  Report at DH-0012.)  According to Officer Buelow, he "observed a black male, later identified
5  as [Hammond] leaning up against the wall at 156 Leavenworth St.  The business was closed and
6  the owner had posted 25 MPC signs to detour people from loitering at the above mentioned
7  location."[1]  (Incident Report at DH-0012; *see also* Buelow Decl. ¶ 4.)[2]

   In his declaration, Officer Buelow states that he and Officer Noguchi continued to patrol
Turk street for about a minute and, during that time, he observed that Hammond did not move.
Because Buelow believed Hammond was in violation of San Francisco Municipal Code § 25
("MPC § 25"), he decided to issue a citation to Hammond.  (Buelow Decl., ¶¶ 5-6.)  Officer
Buelow attests that when he approached Hammond, Hammond began to walk away.  (*Id.*, ¶7;
Incident Report at DH-0012.)  When Officer Buelow ordered Hammond to stop, Hammond
complied.  (Incident Report at DH-0012.)  Officer Buelow attests, however, that at the same
time, Hammond either "put his hand into his right front pocket" or "shoved his hand down the
front of his pants, which were very baggy."  (*Compare* Incident Report at DH-0012 *with*
Buelow Decl., ¶ 7.)  When Officer Buelow directed Hammond to remove his hand from his
pocket (or pants), Hammond again complied.  (Incident Report at DH-0012; Buelow Decl., ¶ 8.)

   Officer Buelow attests that, based on his personal experience, the Tenderloin
neighborhood has a high rate of violent crime, robberies, prostitution, and narcotics trafficking.
He also attests, again based on his personal experience, that individuals involved in such
activities often carry weapons.  (Incident Report at DH-0012; Buelow Decl., ¶ 8.)  Officer
Buelow further attests that when he and Officer Noguchi stop individuals to issue citations for
violations of MPC § 25, "we routinely ask if the person we stopped has any weapons," to assure

---

[1] "25 MPC" refers to San Francisco Municipal Police Code § 25.

[2] Hammond contends that he was walking down Turk street at the time the Officers approached him and generally denies the Officers' version of events.  (*See* Falk Decl. I, Ex. C (Declaration of David Hammond).)  The Court concludes that the disputed facts are not material to the outcome of this motion because, if the Court accepts the Government's version as true, the Defendant still prevails.

2

officer safety. (Buelow Decl., ¶ 6.) In this instance, Officer Buelow decided to conduct a weapons search because of Hammond's gesture, his size, and his bulky clothing. At that point, Officer Buelow claims Hammond again moved his hand to his waistband area, and said "No, you're not going to touch my fucking body." (*See* Incident Deport DH-0012 ("Hammond again put his hand into his right front waistband area...."); Buelow Decl., ¶ 8 ("Hammond ... shoved his hand again down his pants in the same area as before....").)

At some point during this exchange, Officer Buelow placed his hand on his holster. It is undisputed that before Officer Buelow conducted a weapons search, Hammond either walked or ran away from the scene. Officer Buelow then called for back up using an emergency code, numerous other officers arrived on scene, and, following what is described in the police reports as chase and a violent struggle, Hammond was brought down by the officers, one of whom discovered the firearm in the waistband of his pants. (*See* Incident Report at DH-0012.)

## ANALYSIS

Hammond contends that he was unlawfully seized at the time Officer Buelow initially approached him. Because the Officers did not have probable cause to arrest him and did not have reasonable suspicion to support detain and search him under *Terry v. Ohio*, 392 U.S. 1 (1968), Hammond asserts that any evidence recovered must be suppressed as the fruit of the unlawful seizure.

The Government counters by arguing that Hammond was not seized until after the struggle with the officers, by which time they had already discovered the firearm. In the alternative, the Government argues that the officers had reasonable suspicion to conduct a *Terry* stop and also had reasonable suspicion to believe Hammond was armed. Finally, the Government argues that Hammond's subsequent flight attenuated any taint from an initial unlawful seizure.

### 1. Hammond Was Seized.

A person is "seized" for purposes of the Fourth Amendment, when law enforcement officers terminate his or her freedom of movement either by physical force or by a show of authority to which the person submits. *See, e.g., California v. Hodari D.*, 499 U.S. 621, 626-27

(1991).³  The Government contends that *Hodari D* controls, because Hammond never submitted to Officer Buelow's show of authority and, thus, was not seized.  The Court disagrees.

In the *Hodari D* case, upon seeing the officers, the defendant immediately fled.  *Hodari D.*, 499 U.S. at 623.  Based on those facts, the Supreme Court concluded he never submitted to the officer's show of authority and, thus, was not seized.  *Id.* at 629.  In contrast, according to Officer Buelow, when they initially approached Hammond and directed him to stop, he did.  When Officer Buelow directed Hammond to remove his hand from his waistband, Hammond also complied with that directive.  (*See* Buelow Decl. ¶ 7; Incident Report at DH-0012.)  Accordingly, the Court concludes that Hammond submitted to Officer Buelow's show of authority and, therefore, was seized.  The Court turns to whether that seizure was supported by reasonable suspicion and the impact of Hammond's decision to leave the scene.

**2.   The Seizure Was Unlawful and the Government Has Not Demonstrated that the Subsequent Events Attenuated the Taint.**

In order to effect a valid *Terry* stop, the Government bears the burden to show that Officer Buelow had a reasonable, articulable suspicion that Hammond was engaged in criminal activity at the time he was stopped.  *Terry*, 392 U.S. at 24 (1968); *see also United States v. Thomas*, 863 F.2d 622, 625, 628 (9th Cir. 1988).  "Reasonable suspicion requires 'specific, articulable facts' which, together with 'objective and reasonable' inferences, form a basis for suspecting that a particular person is engaged in criminal conduct."  *United States v. Thomas*, 211 F.3d 1186, 1189 (9th Cir. 2000) (quoting *United States v. Hernandez-Alvarado*, 891 F.2d 1414, 1416 (9th Cir.1989)).

Officer Buelow premised his investigatory stop of Hammond on MPC § 25, which provides that "[n]o person shall wilfully remain upon any private property or business premises after being notified by the owner, lessee, or other person in charge thereof to leave."  MPC § 25(a).  The notification referred to in subparagraph (a) "may be oral or in the form of a written

---

³   The Government makes much of the fact that Officer Buelow did not touch Hammond.  (*See* Opp. Br. at 5:4-8; Buelow Decl., ¶ 8.)  However, because a person can be seized either by physical force or a show of authority without physical force, the Government makes much ado about nothing.

4

notice, posted in a conspicuous place, *describing the specific area* and hours in which persons are to keep off or to keep away." *Id.* § 25(c) (emphasis added).

The notice posted at 156 Leavenworth states:

**NO TRESPASSING**

REQUEST FOR ENFORCEMENT OF MUNICIPAL POLICE CODE SECTION 25

...

To the San Francisco Police Department:

I hereby request that the San Francisco Police Department enforce the above Municipal Police Code Sections on my behalf and in my absence. I have given no person(s) permission to *sleep, lie, or in any way remain within my doorway* located at 156 Leavenworth (private property) while my business is closed.

I further state that I will notify the San Francisco Police Department in writing within 24 hours if I do give a person(s) permission to *sleep, lie, or in any way remain within said doorway*, proving the Police Department with the person(s) name.

I agree to post a copy of this notice in a location where it will be visible to all persons within said area. I understand that this letter of request expires six months after the below-signed date.

(First Declaration of Frederick Anderson ("Anderson Decl. I"), Ex. A (emphasis in italics added).) The Government concedes that the notice posted at 156 Leavenworth expired in 2008. (*See* Anderson Decl. I, ¶ 3, Ex. A; Second Declaration of Elizabeth Falk ("Falk Decl. II"), Exs. D, E (Declaration of Lianne Wong, ¶¶ 1-4).)

Hammond argues that standing on a public sidewalk and leaning against a wall does not violate MPC § 25. Thus, according to Hammond, Officer Buelow's decision to effect a *Terry* stop was premised upon a mistake of law, *i.e.* a mistaken understanding of what is prohibited by MPC § 25. The Government argues Officer Buelow simply was mistaken as to the fact that the notice had expired, but that he otherwise had reasonable suspicion to believe Hammond violated MPC § 25. If Officer Buelow correctly understood MPC § 25 and the facts observed, or if he correctly understood the law, but made a good faith error regarding the facts, the Court could conclude that he had reasonable suspicion to stop, and cite, Hammond. *See United States v. King*, 244 F.3d 736, 738-39 (9th Cir. 2001) (citing *United States v. Rojas-Millan*, 234 F.3d

5

464, 469 (9th Cir. 2000), *United States v. Twilley*, 222 F.3d 1092, 1096 n.1 (9th Cir. 2000)). A court also can find that reasonable suspicion exists "when an officer was mistaken about the exact content of the law, but the defendant was still in violation of the law." *Id.* (citing *United States v. Wallace*, 213 F.3d 1216, 1220 (9th Cir. 2000)).

However, if "an officer makes a ... stop based on a mistake of law, the stop violates the Fourth Amendment." *Twilley*, 222 F.3d at 1096; *see also Beier v. Lewiston*, 354 F.3d 1058, 1065 (9th Cir. 2003) (noting in a Section 1983 case addressing qualified immunity, "we have repeatedly held that a mistake about the law cannot justify a stop, let alone an arrest, under the Fourth Amendment") (citing cases). The Ninth Circuit has concluded that "even a good faith mistake of law by an officer cannot form the basis for reasonable suspicion, because 'there is no good-faith exception to the exclusionary rule for police who do not act in accordance with the governing law.'" *King*, 244 F.3d at 739 (quoting *United States v. Lopez-Soto*, 205 F.3d 1101, 1106 (9th Cir. 2000); *see also United States v. Song Ja Cha*, 597 F.3d 995, 1005 & n. 8 (9th Cir. 2010) (rejecting government argument that *Herring v. United States*, __ U.S. __, 129 S.Ct. 695 (2009) precluded exclusion of evidence and concluding that Ninth Circuit authority "holding that the good faith exception does not apply to mistakes of law are still good law").

Thus, the key issue to be resolved is whether by standing against the wall of 156 Leavenworth, Hammond violated MPC § 25. The Court and the parties were unable to locate any case law interpreting MPC § 25, and the Court begins as it must with the plain language of the regulation. *See, e.g., United States v. Daas*, 198 F.3d 1167, 1174 (9th Cir. 1999). MPC § 25(a) prohibits (1) willfully, (2) remaining upon private property or business premises, (3) after having been notified to leave. The Government argues that Officer Buelow knew that the regulation consisted of each of these elements and believed that Hammond's conduct satisfied them. If the Court focused solely on subsection (a), the Government's argument might be persuasive, because the ordinary meaning of the term "notified" is to "make known" or "to give formal notice." *See* Webster's Ninth New Collegiate Dictionary at 808 (1987).

However, the Court cannot read subsection (a) in isolation. *King*, 244 F.3d at 740 (interpreting meaning of "upon" by reference both to ordinary meaning and "the context of the

6

word in the statute"). Subsection (c) expands upon the meaning of the term "notified" and requires something more than simply making it known to a person that they must leave the premises. Rather, the notification must identify "the specific area ... in which persons are to keep off or to keep away." MPC § 25(c). The record establishes that the "notice" at issue prohibits standing, sleeping, or lying in the *doorway* of the premises. (Anderson Decl., Ex. A; Falk Decl. II, Ex. D). Hammond was not standing, sleeping, or lying in the doorway of the premises when Officer Buelow approached him and, thus, was not violating MPC § 25.

The Ninth Circuit recognizes that law enforcement officers sometimes may be wrong about "why an act is illegal while still having a reasonable suspicion that it is illegal." *King*, 244 F.3d at 739 (citing *Wallace*, 213 F.3d at 1220).[4] But it also has not "hesitated to require strict adherence to the language of a ... regulation where the regulation leads to an investigatory stop that results in a Fourth Amendment seizure." *Id.* at 741. The Court concludes that this case is more in line with *King* and *Twilley*, than with *Rojas-Millan* or *Wallace*. If Hammond had been lingering or sleeping in the doorway, and if Officer Buelow believed in good faith that the notice had not expired, the Court could find that the stop was supported by reasonable suspicion. In that situation, Officer Buelow simply would have been mistaken as to the facts. However, that is not this case. Even if the notice had not expired, Hammond was not engaged in an activity prohibited by the notice. Therefore, Officer Buelow's decision to stop Hammond was not objectively grounded in the governing law, and because Officer Buelow made a mistake of law, the stop is objectively unreasonable. *Id.* at 741-42.

The Court next examines whether the subsequent events attenuated any taint associated with the unlawful stop. It is well established that a "but for" connection is not sufficient. Rather, the appropriate inquiry is whether the Officers obtained the evidence "by exploitation of the illegality or instead by means sufficiently distinguishable to be purged of the primary taint."

---

[4] MPC § 22 does prohibit "willfully and substantially obstruct[ing] the free passage of any person or persons on any street, sidewalk, passageway, or other public place." MPC § 22(a) There are no facts in the record that would support a conclusion that Hammond was violating this provision of the San Francisco Municipal Police Code, when he was stopped by Officer Buelow.

7

*Wong Sun v. United States*, 371 U.S. 471, 487-88 (1963) (internal quotation marks omitted). In order to make this determination, the Court considers the following three factors: (1) the time lapse between Hammond's unlawful seizure and the recovery of the weapon; (2) whether there were independent, intervening circumstances; and (3) the purpose and flagrancy of the initial misconduct. *See Brown v. Illinois*, 422 U.S. 590, 603-04 (1975); *United States v. Washington*, 387 F.3d 1060, 1073 (9th Cir. 2004).

As is evident from Officer Buelow's declaration and the Incident Report, there was an extremely short period of time between Hammond's seizure and the recovery of the firearm, and this factor weighs in Hammond's favor.

With respect to the second factor, the Government suggests that Hammond's subsequent conduct constituted independent intervening circumstances and gave the Officers probable cause to arrest Hammond for a violation of California Penal Code § 148(a). Immediately after the unlawful seizure, Officer Buelow advised Hammond that he intended to search him for weapons, which Officer Buelow attests was based on Hammond's moving his hand, Hammond's size, and the fact that the neighborhood is known types of crimes Officer Buelow associates with weapons. Given the discrepancy between the Incident Report and Officer Buelow's declaration, the Court finds Hammond's allegedly furtive gesture to be ambiguous at best, and reiterates that Hammond showed his hands when directed to do so by Officer Buelow. Hammond's size, the nature of his clothing, and the neighborhood do not add to the reasonableness of Officer Buelow's belief that Hammond was armed, especially in light of the extremely minor offense for which he was purportedly stopped. *See United States v. Flatter*, 456 F.3d 1154, 1157-58 (9th Cir. 2006).

Officer Buelow also attested that he "routinely" asks persons stopped for MPC § 25 violations if they have weapons. (Buelow Decl., ¶ 6.) The Ninth Circuit has said that such questioning is not necessarily unjustified, but it noted that "where the officer has less than a reasonable belief or suspicion directed at the person to be frisked, the manner in which the officer conducts the investigation or the posing of an unjustified question cannot be used to create the reasonable suspicion of fear for one's safety that is required under *Terry* to justify a

frisk." *Thomas*, 863 F.2d at 629 & n. 8. Thus, the Court finds this case to be distinguishable from cases where a defendant's decision to flee has been deemed to be entirely voluntary. *See, e.g, United States v. Garcia*, 516 F.2d 318, 319-20 (9th Cir. 1975); *United States v. Smith*, 2009 WL 2969532, *9-*11 (D. Nev. Sept. 14, 2009). The Court finds that, on the facts of this case, Officer Buelow's actions were more than the "necessary condition" leading to Hammond's actions. Rather, these facts suggest that Officer Buelow's actions were likely to induce Hammond to act as he did. Accordingly, the second factor weighs in Hammond's favor.

Finally, the Court finds that the third factor weighs in Hammond's favor. The Ninth Circuit has concluded that suppression under this factor would be warranted "if the law enforcement officials conducted the illegal search with the purpose of extracting the evidence in question, or if they flagrantly broke the law in conducting the search." *United States v. Crawford*, 323 F.3d 700, 721 (9th Cir. 2003), *rev'd on other grounds*, 372 F.3d 1048 (9th Cir. 2004). The record shows that Officer Buelow has issued hundreds of citations for violations of MPC § 25 at 156 Leavenworth. Therefore, the Court could infer that he would have been familiar with the contents of the notice and the type of conduct that it prohibited. Moreover, the Court has determined that Officer Buelow did not have reasonable suspicion to search Hammond. Although the Court does not find that Officer Buelow acted in bad faith, the Court does find that Officer Buelow's conduct was a flagrant violation of Hammond's rights. Accordingly, the Court concludes that the Government has not met its burden to show the taint of the initial unlawful seizure was attenuated.

## CONCLUSION

For the foregoing reasons, Hammond's motion is GRANTED. The parties shall appear as scheduled on May 27, 2010 at 2:30 p.m., and shall be prepared to set dates going forward.

**IT IS SO ORDERED.**

Dated: May 18, 2010

JEFFREY S. WHITE
UNITED STATES DISTRICT JUDGE